[Sac. No. 2070. Department Two.—October 5, 1914.]

GLENNA WILMARTH, Respondent, v. THE PACIFIC MUTUAL LIFE INSURANCE COMPANY OF CALIFORNIA (a Corporation), Appellant.

ACCIDENT INSURANCE—INJURY IN ELEVATOR—WHETHER ELEVATOR USED BOTH FOR FREIGHT AND PASSENGERS IS "PASSENGER ELEVATOR."—A provision in an accident insurance policy for double indemnity in case the insured is injured "while in a passenger elevator (excluding elevators in mines)" has reference not only to elevators used exclusively for passengers, but also to elevators customarily used for conveying passengers, though also used for carrying freight and not specially equipped with safety appliances.

Id.—Analogy Between Elevators and Trains.—The analogy between "freight cars" and "passenger cars," and "freight elevators" and "passenger elevators," is not complete, but if it were, an elevator used for conveying both freight and passengers is quite similar to a "mixed train," which is recognized as a "passenger train."

Id.—Elevators—Liability of Owner Analogous to that of Carrier.—The liability of the owner of an elevator for injuries to passengers is analogous to that of a common carrier.

Id.—Action to Recover Insurance—Evidence of Understanding of Parties as to Meaning of Provision in Policy.—In an action on an accident insurance policy containing a provision for double indemnity in case of injury in a passenger elevator, evidence of a conversation between the insured and the person who procured the insurance is not admissible to show their understanding of the meaning of such provision, when there is no ambiguity in its words and there is no evidence that such person had authority to amplify or explain the meaning of the policy.

Id.—Expert Testimony—Admissibility to Show Meaning of Terms in Policy.—Nor is testimony admissible in such action that among manufacturers of elevators the term "passenger elevator" has attained a definite meaning generally, and that the elevator in which the accident in question happened was not a "passenger elevator." Whatever the terms "passenger elevator" and "freight elevator" may mean technically to those engaged in their manufacture, these expressions in a policy of insurance are to be construed in their ordinary and popular sense.

Id.—Use of Elevator After Accident—Evidence to Show—Harmless Error.—The admission of testimony that after the accident the elevator was used for carrying passengers is harmless error, if the evidence establishes, without contradiction, that the manner in which and the purposes for which the elevator had been used prior to the accident and the subsequent use were not different.

Id.—Extent of Use of Elevator for Passengers—Admissibility of Opinions of Employees to Show.—Employees of the owner of the elevator may testify that it was used for passengers during a certain percentage of its trips. This is the sort of opinion evidence that persons not experts may give, when they have "opportunity of observation, ordinary attention and intelligence and veracity"; and the objection that they have taken no accurate or systematic data with reference to the trips of the elevator goes rather to the weight than to the admissibility of their testimony.

Id.—Injury to Person Alighting from Elevator—Whether Covered by Policy.—Under a policy of accident insurance which provides a double indemnity in case the insured is injured "while in a passenger elevator," the insurer is liable for the double indemnity when a passenger sustains injuries while alighting from an elevator

from which he dies. A flexible, not a rigid meaning, should be attached to the expression "while in a passenger elevator."

ID.—INSTRUCTION IN ACTION FOR DOUBLE INDEMNITY—WHEN PROPERLY MODIFIED.—In an action to enforce such liability the modification of an instruction that the plaintiff cannot recover a double amount unless the bodily injury "was sustained by him [the deceased] while in a passenger elevator," by inserting the words "or the proximate cause thereof" after the word "injury," is proper.

ID.—AUTHORSHIP OF INSTRUCTIONS—PROPRIETY OF COURT REVEALING TO JURY.—In giving instructions to the jury the court does not err in prefacing them with a statement as to the party requesting them. The jury must know that, when adopted, the instructions become those of the court without regard to their authorship.

APPEAL from a judgment of the Superior Court of Sacramento County and from an order refusing a new trial. C. N. Post, Judge.

The facts are stated in the opinion of the court.

W. H. Davis, A. N. Seymour, and Archibald Yell, for Appellant.

Devlin & Devlin, for Respondent.

MELVIN, J.—Defendant appeals from the judgment and from an order denying its motion for a new trial.

The suit was upon a policy of accident insurance issued to Charles B. Wilmarth, husband of the plaintiff. Mr. Wilmarth was killed by a fall from an elevator and the defendant acknowledged liability under the policy for the sum of five thousand five hundred dollars which was paid into court. The policy provided that the indemnity therein specified should be doubled if the bodily injury should be sustained by the insured "while in a passenger elevator (excluding elevators in mines)." Judgment was given for the amount of double indemnity and appellant's principal objections thereto are based upon the alleged errors of the court in giving instructions relative to the meaning of the expression "passenger elevator."

The elevator in question was in the Studebaker building in the city of Sacramento. The building was five stories in height and was occupied by the Studebaker Company in the conduct of its business of selling automobiles, wagons,

and other vehicles and farming implements.   The record contains a photograph of the elevator as well as a description of its dimensions.   The floor of the elevator was nine feet two inches wide and nineteen feet six inches long.   The long sides were protected by substantial wire nettings but the ends were open.   At the entrances to the shaft on the floors of the building there were gates which moved in grooves in upright posts set at the corners of the shaft.   These gates moved up and down and were balanced by weights attached to pulleys, much in the same manner that windows are commonly provided with counterweights.

The accident which resulted in Mr. Wilmarth's death occurred at a time when a salesman of the Studebaker Company, Mr. Halsey Smith, was in charge of the elevator.   Mr. Shearer, an employee of a contractor who was doing some electrical work in the building, and Mr. Wilmarth, who was secretary of the association giving the citrus fair, got into the elevator at the ground floor.   Mr. Wilmarth took a position near the operator and gave him a cigar and in response to an inquiry by the latter said that he wanted to get off at the third floor.   No attempt was made to stop the elevator at the second floor but Mr. Shearer stepped off there, the gate to the elevator shaft being raised.   Mr. Wilmarth dashed past Smith as the elevator approached the second floor.   The latter hearing a noise looked around and saw Mr. Wilmarth with his feet upon the floor of the building and the elevator just scraping his shoulders.   Mr. Shearer who had stepped off the elevator at the second floor and had advanced eight or ten feet, heard an unusual noise and turning saw Mr. Wilmarth with his shoulders against the edge of the platform and his feet on the second floor.   No part of his body was in the elevator. "I tried to catch him," said Mr. Shearer in his testimony. "The elevator was off the floor about two and one-half or three feet and he just tipped right back and went down the shaft and his feet dragged over.   The elevator was going up all the time."   The distance from the second floor of the building to the bottom of the raised gate was six and one-half feet.

The evidence shows that the elevator had long been used for conveying both freight and passengers.   It had a guaranteed capacity for eight thousand pounds which had probably been exceeded on at least one occasion.   The Studebaker Company

maintained an electric garage on the second floor and eight or nine electric automobiles were daily taken up and down in the elevator. The third floor was not occupied by merchandise but was being reserved for a citrus fair which was to be given and which was given at a time commencing two days after the accident. About a week previous to Mr. Wilmarth's death a ball had been given on the floor assigned to the citrus fair by the management of that enterprise. The elevator was used in conveying the guests who attended the ball in large numbers. On that occasion the manager of the Studebaker Company put an extra man on the elevator to attend to opening and closing the gates and to prevent overcrowding. During the progress of the fair, gates were placed inside the elevator and ingress and egress were permitted only through one of these gates. The elevator was commonly used by the employees of the Studebaker Company in passing between the various floors of the building and in conveying customers. It was also used in moving all of the automobiles and other merchandise belonging to the corporation.

Appellant's first point of attack is upon the following instructions given by the court:

"The court instructs the jury in this case that a passenger elevator, within the meaning of the terms of the policy of the insured is one in which passengers are ordinarily carried. If you find from the evidence that the elevator referred to in the evidence was one in which passengers were, on and prior to February 11, 1911, carried up and down at various times, it was a passenger elevator within the meaning of the policy, at the time of the injuries received by Wilmarth, although it may have been used for purposes of carrying freight.

"The court instructs you that a passenger elevator need not be of any particular form, or made in any particular way, or with any particular contrivance or device. It does not mean that it must be used exclusively for the carriage of passengers. If it is customarily used for the carriage of passengers, this is sufficient to constitute it a passenger elevator within the meaning of the policy. If the jury believe that a large number of persons have been carried at various times in this elevator, as passengers, and has been used daily for the carriage of persons, it then is a passenger elevator.

"The court instructs the jury that a passenger elevator need not be of any particular form or size or have any particular

kind of gate or safety contrivance. If an elevator is customarily used for the purposes of carrying human beings as passengers from one floor of a building to another floor in the same building, it is to be considered a passenger elevator.''

The court refused the following proposed instructions of the defendant:

''I instruct you that if said elevator was designed and constructed for the carriage of freight and was prior to and up to the time of the injury to the insured used for the carriage of freight, then said elevator is not a passenger elevator within the terms of the policy of insurance issued by the defendant to said insured.

''I instruct you that an elevator designed and constructed for the purpose of carrying freight and used in the carriage of freight, although the same may at times be used for the carriage of passengers, is not a passenger elevator within the meaning of the policy of insurance referred to in the pleadings and evidence in this case.''

Appellant contends that the purpose which the insurer had in mind was to offer double indemnity for accidents suffered in elevators devoted to the carriage of passengers exclusively because such elevators are commonly more carefully safeguarded than those used for the moving of freight and that the chances of accidents from their operation are very slight. The answer to this position of appellant is that if the insurer had intended such a limitation upon the term ''passenger elevator'' it would have been very easy to express the exact meaning desired. But, counsel for defendant assert, there is a complete analogy between the terms ''freight car'' and ''passenger car'' and the expressions ''freight elevator'' and ''passenger elevator,'' and the ordinary man when he uses the term ''freight car'' or ''passenger car'' immediately pictures in his mind a type of construction. So also (they argue), the terms ''freight elevator'' and ''passenger elevator'' convey definite pictures of types of elevators. There are two objections to this argument. One is that types of elevators are not crystallized in the mind like types of cars and the other is that the only reason for associating the terms ''freight car'' and ''passenger car'' with definite forms of construction is that customarily the types named are devoted to the one or the other purpose of carrying merchandise or persons so that after all it is the *customary use* of the car which gives each

term definite outline in the mind. While there are many elevators devoted exclusively to the carriage of passengers and many to the moving of merchandise only, there are very many used for both purposes. For illustration: In the building in which this opinion is being prepared there are three elevators. Two of them are used for the carrying of people only. The third which is very large conveys merchandise and heavy articles of various kinds but it is often used to carry passengers and is constructed with all of the same sort of safety appliances as those which are in use upon the other elevators. The only apparent difference between them is that one is larger and stronger than the other. Most of us are familiar with the "two-story" type of elevator, formerly much in vogue in rural hotels, having a compartment for passengers and beneath it one for carrying trunks. The analogy between elevators and cars therefore is not complete. But even if we were to accept an analogy between elevators and trains, such an elevator as we are here discussing would be quite similar to a "mixed train" which is recognized as a "passenger train." (*Chicago Great Western Ry. Co.* v. *St. Paul Union Depot Co.,* 68 Minn. 224, [71 N. W. 23].)

In determining the liability of the owner of an elevator for injury to a passenger this court has long been committed to the doctrine that the responsibility is analogous to that of a common carrier. (*Treadwell* v. *Whittier,* 80 Cal. 576, [13 Am. St. Rep. 175, 5 L. R. A. 498, 22 Pac. 266].) At page 585 (of 80 Cal.) the report of the opinion in that case contains the following language: "The defendants used their elevator in lifting persons vertically to the height of forty feet. That they were carriers of passengers, and should be treated as such, we have no doubt. The same responsibilities as to care and diligence rested on them as on the carriers of passengers by stage-coach or railway." In that case, as in this, the elevator was used for moving merchandise and for transporting customers from floor to floor of the building. In *Berliner* v. *Travelers' Ins. Co.,* 121 Cal. 459, [66 Am. St. Rep. 49, 41 L. R. A. 467, 53 Pac. 919], the court was discussing a policy of insurance which promised double indemnity if the injuries should be received while the person insured should be "riding as a passenger in any passenger conveyance using steam." He was killed while riding, by invitation of the superintendent, on the engine of a passenger train. It

was·contended that the engine was not a conveyance provided for the transportation of passengers.    After citing the well recognized rule that policies of insurance are to be liberally construed in favor of the assured, the court held that the locomotive was a part of the "conveyance" provided for the transportation of passengers.    The court said among other things: "If it had been intended to restrict the insured to any particular part of the conveyance, apt words to express such intention could have been readily found and used."    Speaking of the meaning of the word passenger as employed in that policy and applying to Mr. Berliner, the court further said: "Though upon the engine, he was a passenger.    That he did not lose his character as a passenger by going upon the engine at the request of an officer of the road, see *Lake Shore etc. R. R. Co.* v. *Brown*, 123 Ill. 186, [5 Am. St. Rep. 510, 14 N. E. 197]; *McGee* v. *Missouri Pac. Ry. Co*, 92 Mo. 208, [1 Am. St. Rep. 706, 4 S. W. 739]; *Nashville etc. R. R. Co.* v. *Erwin* (Tenn.), 3 Am. & Eng. R. R. Cas. 465.    These were cases that involved the liability of the railroad company for injury to its passengers while rightfully upon the engine, and were not cases of accident insurance; but the word 'passenger' as here used is evidently intended to designate the character or relation the insured sustained to the proprietor of the conveyance, and are therefore in point."    If the word "passenger" in a policy as applied to the individual must be measured by the relation of the carrier to the person injured, must not the word when used adjectively and applied to the conveyance or vehicle be similarly construed?    We see no escape from such a conclusion.

In *Travellers' Ins. Co.* v. *Austin*, 116 Ga. 264, [94 Am. St. Rep. 125, 59 L. R. A. 107, 42 S. E. 522], the policy under review was one in which the beneficiary was guaranteed double indemnity if the insured were injured "while riding as a passenger and being actually in or upon a railway passenger car."    Mr. Austin who was a paymaster of the railroad company was killed while traveling in his "pay car."    It was held that he was not in contemplation of the contract a "passenger" and that his car, although it was capable of being used as a vehicle for the transportation of passengers and had formerly been so used, was not a "passenger car" within the meaning of the words of the policy.    Special stress was laid in that case upon the fact that the assured was an em·

ployee and the court reviewed and carefully differentiated the facts from those of the Berliner case, saying: "That case, however, cannot properly be compared to the one now under consideration because the *relationship of the insured to the railroad company,* in the two cases was widely different." The authority is directly in point on the theory of respondent that the use to which a vehicle is put is the criterion.

In *Aetna Life Ins. Co.* v. *Frierson,* 114 Fed. 66, [51 C. C. A. 434], Mr. Justice Lurton, then a circuit judge, was examining a case involving a provision exactly similar to the one in the policy in the Berliner case. Frierson had met his death while on a steamer in which he and his companions were being taken up an Alaskan river. One man on the boat was a passenger who had paid his fare. Others of the party were navigating the steamer and all except the passenger named above were to pay for their food and transportation with one-half of their earnings during the first two years in Alaska. It was held that Frierson was a passenger on a passenger conveyance and the learned judge said: "That the 'Jessie' was not 'a public conveyance in the usual lines of travel as a common carrier of passengers' may be true. But, if the insurance company intended to limit the benefits of its contract to passengers who travel 'in conveyances operated in the usual lines of travel as common carriers,' it should have so stipulated. This it did not do."

Under the authorities above cited we are satisfied that the instructions given by the court were correct and that those refused were properly rejected.

Appellant has cited numerous cases to the effect that one who rides in a freight elevator is not entitled to demand the same appliances for safety as are requisite to a passenger elevator, and that such a person assumes the greater risk incurred by intrusting himself to the less carefully safeguarded elevator, just as one who accepts carriage on a freight train does so at the peril of incurring the dangers incident to that mode of travel but absent from transportation on a passenger train. Such is the doctrine of *Kappes* v. *Brown Shoe Co.,* 116 Mo. App. 154, [90 S. W. 1158], cited by appellant. That was a case in which the elevator had been used for freight and for carrying employees of the defendant. The shaft was protected by gates similar to the ones in the Studebaker building. At closing time a number of workmen on the sixth floor

crowded against the gate and the operator of the elevator re-
fused to open it, proceeding on his way to the seventh floor.
Some of the people in the front of the crowd raised the door
and were pushed into the shaft by the pressure of their fellow
workmen behind them.   It was held that the gate was prop-
erly constructed and that the negligence of the persons who
raised it contributed to the accident.   There was no question
of injury to a passenger and the case is only valuable as hold-
ing that an elevator not used exclusively for passengers but
mainly for freight need not have the same safety devices as
one dedicated exclusively to the carrying of passengers.   So
in *Hall* v. *Murdock,* 114 Mich. 233, [72 N. W. 155], the rule
announced was that when a man is invited to ride upon a
freight elevator—that is "one designed for freight alone"—
he must be held to know that it is not equipped with the same
regard to safety as a passenger elevator.   *Sievers* v. *Peters
Box & Lumber Co.,* 151 Ind. 642, [50 N. E. 877, 52 N. E. 399],
dealt with an accident in which the person injured who was
in the employ of the defendant, rode on a freight elevator on
the first day of its operation by invitation of a fellow-servant
but without the knowledge or consent of the employer.   The
case involved no determination with reference to an elevator
held out by its owner to the use of passengers.   *Hoehmann* v.
*Moss Engraving Co.,* 4 Misc. Rep. 160, [23 N. Y. Supp. 787],
also involved the riding of a servant in a freight elevator with-
out consent of his employer.   *Steele* v. *Southern Railway,* 55
S. C. 389, [74 Am. St. Rep. 756, 33 S. E. 509] ; *Chicago &
Alton R. R. Co.* v. *Arnol,* 144 Ill. 261, [19 L. R. A. 313, 33
N. E. 204] ; *Louisville & Nashville R. R. Co.* v. *Bisch,* 120 Ind.
549, [22 N. E. 662] ; *McGee* v. *Missouri Pacific Ry. Co.,* 92 Mo.
209, [1 Am. St. Rep. 706, 4 S. W. 739], cited by appellant,
are all "freight train" cases announcing the well known doc-
trine that where a passenger is received by a company on its
freight train the same degree of care is due him that the road
owes to its passengers on its regular trains, except that in
going on a freight train he acquiesces in the usual incidents
and conduct of a freight train managed by competent and
prudent men.   Not one of these cited cases detracts from the
doctrine that a passenger elevator is one in which passengers
are ordinarily carried.

Mr. Peck who secured the insurance for Mr. Wilmarth and
delivered the policy to him was interrogated with reference

to a conversation held with the assured in which the meaning of the double indemnity clause was discussed. Objections to these questions were sustained upon the ground that defendant was seeking to vary the terms of a written contract by parol. These rulings are attacked upon the ground that it was permissible to show the peculiar and special sense in which the parties to the contract understood its terms of doubtful meaning. In this behalf Wigmore on Evidence is cited (secs. 2461 and 2465). We have no dissent to offer to the doctrines there laid down but they do not apply to the rulings which we are now considering for the reasons: 1. That the words of the agreement are not ambiguous; and, 2. It was not shown that the witness had authority to amplify or explain the meaning of any words in the contract to which he was not a party.

Mr. Van Emon, a veteran manufacturer of elevators, was asked a number of questions for the purpose of establishing the facts that the term "passenger elevator" had attained a definite meaning generally and that the elevator used by the Studebaker Company was not a "passenger elevator." The objections to such questions were properly sustained. The contract was not one requiring expert testimony for its interpretation. Whatever the terms "passenger elevator" and "freight elevator" may mean technically to those engaged in the manufacture of lifts, these expressions in a policy of insurance are to be construed in their ordinary and popular sense.

Over the objection of defendant plaintiff was permitted to introduce evidence to the effect that after the accident the elevator was used for carrying passengers. In any view of the evidence defendant was not harmed by the rulings as the evidence established, without contradiction, the manner in which and the purposes for which the elevator had been used prior to the accident and the subsequent use was not different.

Witnesses Richards and Smith were allowed to testify that. the elevator was used for passengers during a certain percentage of the trips. Both were employees of the Studebaker Company who had opportunities for observing the elevator and the frequency of its use. This was the sort of opinion evidence that persons not experts may give, when they have "opportunity of observation, ordinary attention and intelligence and veracity." (Lewis, Authority on Matter of Opinion, chap. 2, sec. 5.) The objection that they had taken no accurate or systematic data with reference to the trips of

the elevator went rather to the weight than to the admissibility of their testimony.

Defendant moved for a nonsuit for alleged insufficiency of the evidence. The first ground of the motion was that the elevator was not a passenger elevator. This ground has been sufficiently discussed and determined adversely to appellant's contention. The second ground is that the injury sustained by decedent was not received while he was in an elevator. It is the theory of defendant that riding in an elevator is accompanied by very slight risk, while jumping on or from a moving elevator is decidedly dangerous and that in promising double indemnity for injuries received in a passenger elevator the insurer was purposely limiting the *locus* of the accident.

Three cases are cited in support of appellant's position. These are *Anable* v. *Fidelity & Casualty Co.*, 73 N. J. L. 320, [63 Atl. 92] ; *Aetna Life Ins. Co.* v. *Vandecar*, 86 Fed. 283, [30 C. C. A. 48], and *Van Bokkelen* v. *Travelers' Ins. Co.*, 34 App. Div. 399, [54 N. Y. Supp. 307].

In the first case cited the facts were in brief these : The contract of insurance provided double indemnity for injury received while riding as a passenger "in or on a public conveyance propelled by steam." The assured left a train on which he was a passenger and went to a news-stand while the train was stationary. The train started on time and the assured ran across the platform and attempted to get on board the moving train with the result that he was thrown under the wheels and killed. It was held that he was not in or on the car at the time of the accident and that the insurance company was not required to pay double indemnity.

The clause of indemnity considered in *Aetna Life Ins. Co.* v. *Vandecar*, 86 Fed. 283, [30 C. C. A. 48], was the same as that before the court in the Anable case. The assured testified that while standing on the platform as the train approached a station he had his valise in one hand and his other hand was in his overcoat pocket. A sudden lurch of the train threw a fellow passenger against him and he was precipitated to the ground. It was held that while riding on the platform the assured was not a passenger in a passenger conveyance using steam. It will be seen at once that this case is in absolute conflict with Californian authority (*Berliner* v. *Travelers' Ins. Co.*, 121 Cal. 459, [66 Am. St. Rep. 49, 41 L. R. A. 467, 53 Pac. 919].) Judge Thayer wrote a powerful

dissenting opinion in which he said among other things: "The defendant company intended to offer travelers special inducements to become insured against the risk of injury incurred while traveling, by promising them a double indemnity for that class of injuries, and a technical construction ought not to be placed on the policy to shield it from liability for a loss that is fairly within the terms of its contract. It must be borne in mind that the rule is to construe an insurance policy most strongly against the company, because such contracts are invariably drawn by the insurer, and reasonable doubts arising from the language which it has employed should be resolved against it. It cannot be said that the use of the word 'in' in the policy in suit so clearly evidences an intention to pay a double indemnity only in those cases where the insured is injured while traveling on the inside of a railway or street car as to put the case at bar beyond the reach of that rule of construction. In my judgment, the rule in question should, in itself, have led to a different interpretation of the clause relating to double indemnity than the one which has been adopted by the majority of the court." This is quite in accord with the decisions in California and we cannot consider the majority opinion as expressing the rule for us to follow.

The identical clause which was before the court in the other two cases came up for interpretation in the Van Bokkelen case and the court gave strict interpretation to the language, holding that one injured by falling from an open platform of a car was not within the terms of the agreement for double indemnity. We are of the opinion, however, that even conceding the injuries to have followed Mr. Wilmarth's act of leaving the elevator the language of the policy is broad enough to cover such a case. It has been held by the supreme court of Georgia that the assured is entitled to recover the augmented indemnity, although he was injured in attempting to alight from a moving car. (*King* v. *Travelers' Ins. Co.*, 101 Ga. 64, [65 Am. St. Rep. 288, 28 S. E. 661].)

"Actually traveling in a public conveyance" were the words construed in *Tooley* v. *Assurance Co.*, 3 Biss. 399, Fed. Cas. No. 14,098. The assured was hurt while trying to get on board of the moving train which he had left temporarily at the station while it was at a standstill.

A man is "traveling by public conveyance," who attempts to board a moving omnibus. (*Chamlin* v. *Railway P. Ins. Co.,* 6 Lans. (N. Y.) 71.)   The same language was held to apply to a person who was making a journey by connecting steamship and railway lines and fell upon a slippery sidewalk while walking from the steamboat landing to the railway station. (*Northrup* v. *Railway etc. Assurance Co.,* 43 N. Y. 516, [3 Am. Rep. 724].)

*Theobold* v. *Railway Passenger Assurance Co.,* 10 Exch. 45, was a case in which the policy referred to a "railway accident" which might be suffered by the assured while traveling "in any class of carriage."   The assured was injured after the train reached its destination.   He slipped on the step while descending from the carriage to the platform.   He recovered damages.   "A person may be said to be traveling in a public conveyance until he has alighted therefrom and completely disconnected himself therefrom and landed." (May on Insurance, sec. 524.)

In *Depue* v. *Travelers' Ins. Co.,* 166 Fed. 183, the decisions were reviewed and the court expressed the opinion that they could not be fully reconciled.   "The disposition of the courts to construe accident policies against the companies remains, even where the clause under consideration provides for double indemnity.   But in that event it is ordinarily presumed that the parties had a special risk in view, and the construction will endeavor to carry out their intention.   If the language, however, is fairly capable of a construction favorable to the insured, this will be given, although the clause provides for double indemnity.   Thus, in *Preferred Accident Ins. Co.* v. *Muir,* 126 Fed. 926, [61 C. C. A. 456], a case decided in this circuit, the insured was fatally injured by being thrown from the platform of a rapidly moving car, but it was held by the court of appeals that double indemnity could be recovered under a clause providing therefor if the insured should be injured while riding as a passenger in 'or on' a public conveyance, the ground for the decision being that the court was not at liberty to say that when the stipulation reads 'in' or 'on' a public conveyance, this means inside a railroad car.   On the whole, therefore, it seems to me that, since the question of double indemnity is not presented by the present controversy, I am at liberty to adopt what appears to be a reasonable construction of the language used by the policy in suit, and to

hold that a flexible and not a rigid meaning should be attached to the words, 'while in a passenger elevator.' " We fully agree with this interpretation which is in accord with the weight of authority.

Appellant complains of the court's modifications of certain instructions. The purport of these instructions was that the plaintiff could not recover a double amount of insurance unless the bodily injury which resulted in Mr. Wilmarth's death "was sustained by him while in a passenger elevator." The court in each instance inserted the words "or the proximate cause thereof" after the word "injury." This was proper. If the moving cause of the killing of Mr. Wilmarth originated in the elevator that was sufficient even though death was produced by the fall to the basement. In such cases the courts look to the proximate cause of the injury. (*Travelers' Ins. Co.* v. *Murray,* 16 Colo. 296, [25 Am. St. Rep. 267, 26 Pac. 774].)

The court prefaced each group of instructions by saying "The following are the plaintiff's requested instructions" or "The following . . . are given you as instructions requested by the defendant." The revealing of the sources of the instructions is assigned as error. We see no reason (and no authority is given) why the court may not thus indicate the authorship of any given instructions. The jurors must have known that when adopted the instructions became those of the court without regard to authorship. Therefore there was no error committed.

Judgment and order affirmed.

Henshaw, J., and Lorigan, J., concurred.

Hearing in Bank denied.